IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MCDERMOTT GULF OPERATING COMPANY, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION 09-0206-WS-B ) |
| CON-DIVE, LLC, et al., | ) ) |
| Defendants. | ) |

**ORDER**

This matter is before the Court on the motion of defendant Oceanografia S.A.de C.V. ("OSA") to vacate the arrest of the in rem defendants ("the Equipment") and their attachment. (Doc. 29). The parties have filed briefs and evidentiary submissions in support of their respective positions, (Docs. 29-30, 34, 38, 41-44, 51, 55-56, 58-60), as well as several motions to strike. (Docs. 52-54, 64-66, 68, 72, 76). On May 22, 2009, the Court conducted a hearing pursuant to Supplemental Rule E(4)(f), at the conclusion of which the record was closed, save for certain evidentiary objections. (Docs. 61-62). The motion is now ripe for resolution.

**BACKGROUND**

Plaintiff McDermott Gulf Operating Company ("McDermott") is the owner of the Bold Endurance ("the Vessel"), an offshore service vessel. An entity related to McDermott entered a charter party with defendant Con-Dive, LLC in August 2006, with McDermott succeeding to the former's rights. Plaintiff Secunda Marine Services ("Secunda"), another related entity, acted as manager of the charter.

Con-Dive acquired certain specialized equipment ("the Equipment") and placed it aboard the Vessel. OSA utilized the Equipment in the course of fulfilling a contract in

Mexican waters. When the charter party expired on or about March 31, 2009, charter hire of approximately $5 million remained unpaid. The plaintiffs filed this action to recover the unpaid hire.

The plaintiffs moved for a writ of attachment pursuant to Supplemental Rule B, on the grounds that the three defendants (including OSA representative Amado Yanez) were not found in the district but that their property (the Equipment) was. (Doc. 2). The plaintiffs also moved for an order of arrest of the Equipment pursuant to Supplemental Rule C. (Doc. 3). The Magistrate Judge granted both motions. (Docs. 6, 7).

## DISCUSSION

As reflected above, the parties filed a massive amount of material prior to the hearing, including several inches worth of exhibits. At the hearing, the plaintiffs confirmed they had no additional evidence to present, while OSA represented that its additional evidence consisted of two witnesses and four exhibits, all of which were presented at the hearing. Neither party requested permission to submit additional evidence after the hearing, and the Court explicitly closed the record following the hearing. Likewise, the parties filed a total of four briefs before the hearing and were given the opportunity to present additional argument at the hearing, which they fully exercised. Neither party requested permission to submit additional briefing after the hearing, and the Court explicitly closed the briefing after the hearing. The only post-hearing filings requested or allowed were: (1) OSA's filing of an English-language translation of one of the four exhibits it presented at the hearing; (2) OSA's filing of "objections to the admissibility" of a certain declaration filed by the plaintiffs one hour before the hearing; (3) the plaintiffs' filing of "objections to the admissibility" of the exhibits presented by OSA at the hearing; and (4) any additional evidentiary objections to

materials filed before the hearing.  (Docs. 61, 62).[1]

Despite this history, the plaintiffs have submitted a ten-page post-hearing brief, plus three new exhibits.  (Doc. 71).  In response to OSA's motion to strike, the plaintiffs maintain that their filing is perfectly consonant with the governing orders.  (Doc. 73).  It patently is not.

First, the plaintiffs suggest they have merely submitted "evidentiary objections" to the four exhibits presented by OSA at the hearing.  (Doc. 73 at 1).  On the contrary, not a single "objectio[n] to the admissibility" of the hearing exhibits is raised in the plaintiffs' post-filing brief.  Instead, the plaintiffs argue only the credibility and impact of the evidence, and present a declaration and an alternate translation, to counter — not to exclude — OSA's hearing exhibits.  Indeed, the plaintiffs elsewhere candidly admit that their filing merely "*addresses* the evidentiary materials presented for the first time at the ... hearing."  (*Id.* at 3 (emphasis added)).  That it does, but not in a manner requested by the plaintiffs or permitted by the Court.

Second, the plaintiffs insist they learned for the first time at the hearing that OSA does not rely on a written Mexican order but on an oral order, articulated on the Vessel on March 27 of this year.  This radical shift of position, the plaintiffs conclude, entitles them to submit a wholly new affidavit from their legal witness (which purports to go far

---

[1] The plaintiffs were given multiple opportunities to make additional requests to present evidence or argument, which went unexercised and affirmatively rejected.  After the plaintiffs presented their argument, the Court asked if it had "everything in [its] possession right now that will support your position in the case," and counsel responded in the affirmative, requesting only an opportunity for rebuttal, which was granted but never utilized.  After OSA finished its presentation of argument and evidence, the Court inquired of the plaintiffs if there were "any other matters that you want to present at this time," and counsel responded that "the only thing we would ask is the opportunity to address these late filed exhibits."  After the exhibits were discussed, the Court asked a third time if there was "[a]nything further at this time," to which the plaintiffs were silent.  Yet a fourth inquiry whether there was "[a]nything further" drew no response from the plaintiffs, at which point the Court announced, "Okay.  We will receive your objections by Tuesday, take it under submission and rule as soon as possible."

-3-

beyond the written/verbal distinction that supposedly justifies its late submission).  (Doc. 73 at 2-3).  The plaintiffs' own pre-hearing brief, however, contains the following language negating their argument:

> In fact, conspicuously absent from the multitude of documents submitted to the Court by Defendant is any official 'order' from a Mexican court or tribunal dated March 27, 2009 (or otherwise).  Counsel for defendant acknowledges as much as they carefully word their descriptions of what the District Attorney tried to do in Campeche: "the Attorney General's representative then ordered plaintiffs to relinquish possession of the Equipment ....  This was in effect an attachment order, similar to the one issued by this Court."  Doc. No. 30-2, at 7.  *Accordingly, this Court is asked to believe that the oral directions from a local District Attorney in Mexico ... is, in fact, the "March 27, 2009 Order"* which the Plaintiffs are now being accused of flagrantly disregarding.

(Doc. 58 at 5 (emphasis added)).  The plaintiffs by their own admission thus knew long before the hearing that OSA relied on an oral order.[2]  Even had they been truly surprised at the hearing, their recourse would have been to request permission to respond, not to affirmatively represent that all their evidence was before the Court and then unilaterally file an affidavit after the record was closed and the matter taken under submission.

A hearing, like a trial, represents the end of the evidence, not its beginning.  An order (especially one entered after giving the parties an opportunity to make special requests) is an instruction, not a suggestion.  The Court accepts the plaintiffs' assertion that they did not intentionally violate the Court's orders.  (Doc. 73 at 3).  Nevertheless, violate them they did.  The plaintiffs' post-hearing submission and attached documents are **stricken** and will not be considered.  Likewise, the plaintiffs' "proposed order," (Doc. 74) — which is in effect another post-trial brief — is **stricken** and will not be considered.  For similar reasons, OSA's post-hearing notice of filing and attached declaration, as well as its proposed order, (Docs. 67, 70), are **stricken** and will not be considered.

---

[2]The quoted language from which the plaintiffs recognized that OSA relies on a verbal order is contained in a brief filed a full three weeks before the hearing.

**I. Attachment.**

The parties agree that, to survive the motion to vacate, the plaintiffs have the burden to show the following: (1) that they have a valid prima facie admiralty claim against the defendant; (2) that the defendant cannot be found within the district; (3) that the defendant's property may be found in the district; and (4) that there is no statutory or maritime bar to attachment. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2nd Cir. 2006). (Doc. 30 at 8-9; Doc. 41 at 9).

OSA points out that the only claim in the complaint is for charter hire and argues the plaintiffs have no prima facie valid claim for charter hire against it because it was not a signatory to the charter party. The plaintiffs respond that the Equipment is owned by Con-Dive, not by OSA. If this is so, they clearly have a prima facie valid admiralty claim against Con-Dive, since it was the charterer. Perhaps more centrally, without an ownership interest in the Equipment, OSA likely would lack standing to challenge its arrest and attachment.

The evidence, however, reflects that the Equipment is owned by OSA. The plaintiffs rely on documents showing Con-Dive as the purchaser of the Equipment in 2006, but the question is ownership in 2009. OSA has presented an American Bureau of Shipping ("ABS") certificate from October 2008 listing the owner as OSA. (Doc. 42, Exhibit H). The plaintiffs can scarcely challenge the probative value of the ABS certificate, since they rely on ABS records from 2006 to show ownership by Con-Dive. (Doc. 42, Exhibit C).

In more detail, the evidence reflects that Con-Dive purchased the Equipment in 2006, which both the seller's records and ABS records describe as the "Orca" saturation diving system. (Doc. 42, Exhibit C). From approximately October 11 to 13, 2008, the ABS performed a survey of the Equipment as the Vessel lay off the Campeche coast. (Doc. 51, Exhibit H). Certain ABS records from this period reflect the Equipment as the

Orca system.  (*Id.*).  On October 13, ABS issued a certificate of classification for a "Hipocampo IX," described as a "saturation diving system" aboard the Vessel.  Another ABS document from October 2008 states that the Hipocampo IX is the new name for the equipment previously known as the Orca.  (*Id*., Exhibit I).[3]  The certificate of classification identifies OSA as the owner of the Equipment.  (*Id*., Exhibit H).

Confused by reports of ABS documents addressing both Orca and Hipocampo, the plaintiffs asked for clarification.  (Doc. 51, Exhibit I).  OSA's representative responded on October 22 that "[t]he SAT DIVE SYSTEM is the same, we just changed name and ownership ...."  (*Id.*).  This information echoes an October 15 notice from a Con-Dive representative to "whom it may concern" that "the ORCA Saturation Diving System is now property of [OSA]."  (Doc. 51, Exhibit G & Attachment 1).

In light of this evidence, there is no serious question of ownership.  For purposes of the pending motion, the Court finds that OSA owns the Equipment.

To support attachment of OSA's property, the plaintiffs must show they have a prima facie valid claim for charter hire against OSA even though OSA is not a formal party to the charter.  The plaintiffs argue that OSA became a "de facto" charter party under alter ego principles.  They present interesting evidence and argument along these lines, but for reasons stated below the Court need not address them.[4]

The evidence presented in this case reflects, and the Court so finds, that in late March 2009, while the Vessel lay in Mexican waters, the plaintiffs advised that the charter party would not be extended.  OSA thereupon demanded return of the Equipment, which the plaintiffs refused.  On March 26, OSA (a Mexican concern) through its counsel

---

[3]The plaintiffs admit there was only one saturation diving system on the Vessel. (Doc. 41 at 3-4).

[4]For the same reason, the Court need not reach OSA's argument that the plaintiffs did not plead an alter ego theory with the particularity required by Supplemental Rule E(2)(a).

presented a criminal complaint to the Mexican district attorney's office for the State of Campeche.[5]  The following day, the district attorney or his representative boarded the Vessel and verbally ordered the captain to transfer the Equipment to another vessel pending investigation.  Two pieces of equipment were removed, but the process was interrupted by the arrival of the Vessel's representative, who refused to cooperate and instructed the captain to manipulate the ballast so as to deprive the crane operator of a stable deck.  The Vessel sailed from Mexico on April 9, 2009, with the Equipment still aboard.  The Equipment was arrested in Mobile five days later.  (Doc. 19).

OSA presented both an affidavit and the live testimony of a Mexican law professor, who was accepted by the Court as an expert witness.[6]  This witness testified that Mexican law allows a district attorney to investigate a crime upon the filing of a criminal complaint; to order the seizure of disputed property pending investigation; to do so verbally, without any written order; and to do so on a foreign vessel operating in Mexican waters.  (Doc. 55, Exhibit F).  The Court finds and concludes that this accurately states applicable Mexican law.

The plaintiffs object that an oral order is not an order at all, (Doc. 58 at 5), but they provided no evidence of Mexican law on this point.  They also argue that a document created by the district attorney shortly after the March 27 boarding, even if an order of

---

[5]The plaintiffs attempted at the hearing to show that this did not occur until after the Vessel was boarded on March 27.  While the criminal complaint reflects that some authorities may not have received it until March 29 or 30, the document is dated by OSA as March 26.  (Doc. 29, Exhibit D at 5).  Moreover, the district attorney's office confirmed that the criminal complaint was submitted on March 26.  (*Id*. at 6).  While the English translation says the complaint was received on "Thursday, March 2th [sic]," the Spanish original says "Jueves veintiseis de Marzo," (Doc. 38, Supplement to Exhibit D at 6), or Thursday, March 26.  The Court judicially notices that March 26, 2009 was a Thursday.

[6]*See generally* Fed. R. Civ. P. 44.1 (court may consider testimony in determining foreign law).

seizure rather than merely a report, was not binding because it was never served on them, which failure violated their due process rights to notice. (*Id*. at 5-6). They presented an affidavit to that effect. (Doc. 59, ¶ 10). Because OSA does not rely on this document as the subject order, the plaintiffs' argument misses the mark.[7]

Finally, the plaintiffs argue that the district attorney had no jurisdiction to order the Equipment to be transferred to another vessel, on the grounds that this presents a "federal maritime issue." (Doc. 58 at 5). The plaintiffs' witness asserts that this is so, (Doc. 59, ¶¶ 6-10), which presents a direct conflict with the testimony of OSA's witness. The Court accepts the version of OSA's witness for at least the following reasons.

First, and as the plaintiffs acknowledge, the question is one of maritime jurisdiction, and OSA's witness is a longstanding expert in maritime issues, while the plaintiffs' witness is a criminal lawyer with no stated experience in maritime matters.

Second, and by his own admission, the plaintiffs' witness (who also represents them in this matter) was unsuccessful in his effort to persuade the district attorney's superior to declare that the district attorney lacked jurisdiction to act. Instead, the superior retrieved the file "until such time as he would decide on the jurisdictional aspects of this case." (Doc. 59, ¶ 8). When an April 5 order from the district attorney (which prohibited the Vessel from departing Mexico because it still carried the Equipment) was thereafter rescinded, it was not an acknowledgment of no jurisdiction but only an acknowledgment of a jurisdictional question. (Doc. 44, Exhibit H). The plaintiffs' witness recognizes that, as of that point, "the jurisdictional aspects of this matter [we]re still pending." (Doc. 59, ¶ 9).

Third, even the authorities' scrutiny of jurisdiction appears limited to the authority of a state district attorney to prevent the sailing of a foreign vessel (the subject of the

---

[7]The plaintiffs do not claim they received no notice of the oral order, and they plainly did so, since by their own briefing and evidence (as well as that of OSA) it was delivered, repeatedly, to the captain and multiple other representatives of the plaintiffs while the district attorney was aboard the Vessel. (Doc. 58 at 4).

April 5 order) — not his authority to order seizure of property aboard a vessel (the subject of the March 27 order) — since the plaintiffs' witness contacted the district attorney's superior only after, and in an effort to rescind, the April 5 order. (Doc. 59, ¶ 8). OSA's witness testified at the hearing that he had reviewed the district attorney file only three days before and that it was not closed. Moreover, OSA presented a recent document from that office confirming that it is proceeding with its criminal investigation and has summoned witnesses from the plaintiffs to aid "the current pre-trial investigation," including the location of the Equipment. (Doc. 56, Exhibit K). This conduct is not consistent with a governmental suspicion that it lacked jurisdiction to order retention of the Equipment. On the contrary, since the district attorney's superior was to retain the file until satisfied of jurisdiction, the fact that the investigation is being actively pursued indicates that an affirmative decision that jurisdiction exists has been made. Thus, the evidence suggests that the Mexican authorities share OSA's view of the law.[8]

     For present purposes, the Court finds and concludes that the plaintiffs were and are subject to a valid Mexican order requiring them to surrender the Equipment pending the completion of a criminal investigation; that the plaintiffs, through the captain and owner's representatives, were aware of the order; that the plaintiffs violated the order by refusing to allow offloading of the Equipment; and that the plaintiffs further violated the order by departing Mexican waters with the Equipment still aboard. Had the plaintiffs complied with this lawful Mexican order, they could not have attached the Equipment in this jurisdiction, since it would still be in Mexico. The question becomes whether this conduct provides grounds to vacate the attachment.

     As noted by OSA, courts possess "equitable discretion to vacate maritime attachments that comply with Rule B," although "only in certain limited circumstances."

---

[8]The plaintiffs initially argued that the order had been rescinded. (Doc. 41 at 11). The order to which they refer, however, is the April 5 order, not the March 27 order. As discussed in text, there is no evidence that the March 27 order has been rescinded.

*Aqua Stoli*, 460 F.3d at 444.[9]  For example, "[a] maritime attachment would likewise be properly vacated if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets." *Id.* at 444-45.  More generally, the Court "has inherent authority to vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of the plaintiff."  *Maersk, Inc. v. Neewra, Inc.*, 443 F. Supp. 2d 519, 528 (S.D.N.Y. 2006) (internal quotes omitted) (applying *Aqua Stoli*). As the plaintiffs have by their silence acknowledged these propositions, the Court accepts them.[10]

At least two courts, employing the quoted language from *Aqua Stoli,* have vacated attachments when a plaintiff forewent an available foreign forum in favor of a domestic one.  *See Transfield ER Cape Ltd. v. STX Pan Ocean Co.*, 2009 WL 691273 at *4 (S.D.N.Y. 2009); *OGI Oceangate Transportation Co. v. RP Logistics Pvt. Ltd.*, 2007 WL 1834711 at *7 (S.D.N.Y. 2007).  There is no question that OSA was present in Mexico and subject to jurisdiction there, and there is no question that the plaintiffs left Mexico and came to this district to attach OSA's assets.  Moreover, according to the uncontroverted testimony of OSA's witness, by operating in Mexican waters the Vessel and its owners accepted the jurisdiction of the Mexican authorities to resolve their legal issues there.  This case therefore falls comfortably within the example provided in *Aqua*

---

[9]The plaintiffs repeatedly invoked *Aqua Stoli* in their briefing and at the hearing affirmatively endorsed it as the "touchstone" Rule B case.

[10]Although OSA relies on Second Circuit authorities, the Court notes that the Eleventh Circuit has frequently utilized equitable principles in a maritime context.  *See, e.g., Sea Byte, Inc. v. Hudson Marine Management Services, Inc*., 2009 WL 1044702 at *8 (11th Cir. 2009) (equitable estoppel); *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 940 n.2 (11th Cir. 2001) (concursus); *Venus Lines Agency, Inc. v. CVG International, Inc*., 234 F.3d 1225, 1230 (11th Cir. 2000) (laches); *Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591, 594 (11th Cir. 1986) (prejudgment interest); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 565 (5th Cir.1981) (injunction).  In light of this backdrop, the Court sees no reason to assume that the Eleventh Circuit would not accept the Second Circuit view.

*Stoli* and the cases applying it.

Even were there any doubt on this matter, it is more than outweighed by the plaintiffs' conduct in disregarding a lawful order, absent which conduct they could not have obtained attachment to begin with. If the plaintiffs' conduct does not constitute an "improper practice" or "manifest want of equity," it is difficult to imagine what might. To uphold attachment under these circumstances would be to countenance — indeed, to reward — lawlessness. Nothing in equity commends such a result.

The outcome would not change even if the plaintiffs were correct in their position that the district attorney's order was not lawful for want of jurisdiction or a written, served order. The plaintiffs knew perfectly well that they had been ordered by a Mexican district attorney to relinquish disputed property pending a criminal investigation, and they do not deny that district attorneys generally are empowered to issue such orders. What they challenge are the technical niceties of the order — niceties which, as the testimony and other evidence discussed above reflect, do not run plainly in their favor. The plaintiffs were certainly entitled to question the sufficiency of the order, but they were not entitled to ignore it without receiving confirmation from an appropriate authority that they could do so.[11] To allow attachment under such circumstances would be to encourage every litigant to make its own decision whether to obey a government order, based on its own, usually biased, assessment of the order's validity. That way lies anarchy, not equity. The plaintiffs' conduct, even if the district attorney's order were ultimately to prove ineffective, would make a "showing of [an] improper practice or a manifest want of equity" sufficient to deny attachment.

## II. Arrest.

---

[11] The plaintiffs were aware of this, since they appealed to the authorities to rescind the April 5 order prohibiting them from sailing and did not sail until they received verbal confirmation the order had been or would be rescinded.

The Equipment was arrested pursuant to Supplemental Rule C, which provides for an action in rem either "[t]o enforce any maritime lien" or "[w]henever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." The plaintiffs do not assert that any statute supports arrest of the Equipment. Therefore, the propriety of the arrest depends on the existence of a maritime lien. *See Board of Commissioners v. M/V Belle of Orleans*, 535 F.3d 1299, 1314 (11th Cir. 2008) ("The lien and the proceeding in rem are, therefore, correlative — where one exists, the other can be taken, and not otherwise.") (internal quotes omitted); *Industria Nacional Del Papel, C.A. v. M/V Albert F*, 730 F.2d 622, 625 (11th Cir. 1984) ("A court obtains in rem jurisdiction over a vessel when a maritime lien attaches to the vessel."). The plaintiffs acknowledge they bear the burden of showing a maritime lien, although they say they need make only a prima facie showing. (Doc. 41 at 11 (citing *Amstar Corp. V. SS Alexandros T*, 664 F.2d 904, 912 (4th Cir.1981)). The plaintiffs argue they meet this burden both as a matter of maritime law and because the charter party provides for a lien in case of breach.

The charter party states that it "shall be governed and construed in accordance with the Laws of Nova Scotia and the Federal Laws of Canada." (Doc. 29, Exhibit A at 10). The parties agree that, given this provision, the existence of a maritime lien is to be decided under Canadian law (there being no separate Nova Scotian law concerning the creation of maritime liens).

To establish the content of Canadian law, OSA relies on the declaration of a Canadian lawyer and adjunct professor specializing in maritime law. (Doc. 51, Exhibit J). According to that declaration, Canadian law does not recognize a maritime lien arising from breach of a charter party. Nor, because all such liens are legal creations, can a maritime lien arise by agreement of the parties. (*Id*., ¶¶ 7, 8, 12, 15, 19).

In opposition, the plaintiffs rely on the affidavit of another Canadian barrister specializing in maritime law. (Doc. 58, Attachment 6). The affiant, however, does not contradict OSA's position. Instead, he testifies that breach of a charter party gives rise to

-12-

a maritime *claim* cognizable in Canadian federal court, (*id*., ¶ 6), not a maritime *lien* as required by Rule C. Similarly, he testifies that the provision of the charter party giving the plaintiffs a lien on the charterer's property in the event of breach creates a "maritime contractual lien," (*id*., ¶ 9), not a maritime lien. The affiant testifies that either situation gives rise to a right to arrest the Equipment, (*id*., ¶¶ 5, 9), but a right to arrest is not synonymous with a maritime lien. As OSA's expert notes, Canada recognizes many statutory rights in rem, which allow for arrest but do not constitute maritime liens or afford all the benefits of such liens. (Doc. 51, Exhibit J, ¶¶ 10-12). Specifically, claims under charter parties, including contractual provisions purportedly providing a lien upon breach "solely give rise to statutory rights in rem." (*Id*., ¶¶ 12, 15, 18).

Based on the parties' presentations, the Court finds and concludes that, under governing Canadian law, the plaintiffs have no maritime lien on the Equipment, nor any prima facie showing of one. Accordingly, the arrest cannot be sustained.

### III.  Evidentiary Rulings.

OSA moves to strike the affidavit of Dwayne Smithers and attached exhibits. (Doc. 52). Except for two paragraphs, Smithers' affidavit addresses the plaintiffs' alter ego argument, which the Court does not reach. Likewise, all but two of the attached exhibits are offered in support of the alter ego theory. The motion to strike as to these matters is moot. The charter party is relevant to choice of law, among other matters, and will not be stricken. The seller's documents are relevant to ownership of the Equipment and will not be stricken. Paragraphs 15 and 16 attempt to relate matters occurring on the Vessel on March 27, of which the affiant patently has no personal knowledge, and they will be stricken.

OSA moves to strike the first affidavit of Jose Walterio Pinedo Rivas and attached exhibits. (Doc. 53). The plaintiffs at the hearing withdrew this affidavit, rendering the motion moot.

OSA moves to strike a marine survey report on grounds it is incomplete. (Doc. 54). The plaintiffs responded by submitting the complete document, (Doc. 57), rendering the motion moot.

OSA moves to strike paragraph 12 of the declaration of Ruben Maury Campero to the extent it seeks to opine on the requirements of the Mexican legal process. (Doc. 64). The sentence at issue is highlighted in the plaintiffs' response. (Doc. 75 at 2). The plaintiffs admit the affiant is not an attorney, and they have failed to show his qualification to testify as to such matters. The motion is due to be granted.

OSA moves to strike portions of the second declaration of Jose Walterio Pinedo Rivas. (Doc. 65). Paragraphs 4-6 and 9-10 address the plaintiffs' alter ego argument, and the Court's resolution of the motion to vacate without resolving that argument renders the motion to strike moot. Paragraph 7 addresses events of March 27. The first sentence is not hearsay as contended by OSA because offered not for the truth of the matter asserted but to show what motivated the affiant's conduct. The third sentence is not hearsay because it relates no statement by a non-declarant. The middle sentence is not based on personal knowledge and so will be stricken.

OSA moves to strike portions of the declaration of Eduardo Luengo Creel. (Doc. 66). Contrary to OSA's position, most of paragraphs 6-8 are not hearsay but are based on the affiant's personal participation in a telephone call involving the district attorney and a subsequent personal conference with his superior. The only portions of these paragraphs subject to exclusion are the final sentence of paragraph 6 and all of paragraph 7. Paragraph 9 is not subject to striking for failure to attach referenced exhibits, especially as those exhibits are elsewhere in the record. (Doc. 44, Exhibit H).

Finally, OSA moves to strike portions of the declaration of Donald A. MacLeod and attachments thereto. (Doc. 68). All of the challenged evidence goes to the plaintiffs' alter ego argument, and the Court's resolution of the motion to vacate without reaching that argument renders moot the motion to strike.

The plaintiffs filed no motions to strike before or after the hearing, although given the opportunity to do so. At the hearing, they stated they had no objection to hearing exhibits 1, 2 or 3. The plaintiffs did object to hearing exhibit 4 as unauthenticated and as hearsay and, as noted, were given leave to file post-hearing objections to it. They did not do so, which presumably means the objections are withdrawn. At any rate, hearing exhibit 4 addresses only the ownership of the Equipment, and the Court has found ownership in OSA without considering that exhibit, which would render moot any objection to the exhibit.

## CONCLUSION

For the reasons set forth above, OSA's motions to strike the plaintiffs' post-hearing submission and proposed order, (Docs. 72, 76), are **granted**.

For the reasons set forth above, the motion to strike the first Pinedo affidavit, the marine survey report, and the MacLeod declaration, (Docs. 53, 54, 68), are **denied as moot**. The motion to strike a portion of the Campero declaration, (Doc. 64), is **granted**. The motion to strike the Smithers declaration and exhibits, (Doc. 52), is **granted** as to paragraphs 15 and 16 and is otherwise **denied** and/or **denied as moot**. The motion to strike the second Pinedo declaration, (Doc. 65), is **granted** as to the second sentence of paragraph 7 and is otherwise **denied** and/or **denied as moot**. The motion to strike the Creel declaration, (Doc. 66), is **granted** as to paragraph 7 and the final sentence of paragraph 6 and is otherwise **denied**.

For the reasons set forth above, OSA's motion to vacate, (Doc. 29), is **granted**. The arrest and attachment of the Equipment are **vacated**. The appointment of the Vessel's master as substitute custodian, (Doc. 27), is **rescinded**.

DONE and ORDERED this 29th day of May, 2009.

<u>s/ WILLIAM H. STEELE</u>  
UNITED STATES DISTRICT JUDGE