# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MCDERMOTT GULF OPERATING ) <br>
COMPANY, INC., et al., )<br>
)<br>
    **Plaintiffs,** )<br>
)<br>
v. )     **CIVIL ACTION 09-0206-WS-B**<br>
)<br>
CON-DIVE, LLC, et al., )<br>
)<br>
    **Defendants.** )

## ORDER

This matter is before the Court on the plaintiffs' motion to stay pending appeal and motion for bond. (Docs. 85, 87). Defendant Oceanografia S.A. de C.V. ("OSA") has filed a response to both motions and the plaintiffs a reply, (Docs. 97, 99), and the motions are ripe for resolution.[1]

## BACKGROUND

Plaintiff McDermott Gulf Operating Company ("McDermott") is the owner of the Bold Endurance ("the Vessel"), an offshore service vessel. An entity related to McDermott entered a charter agreement with defendant Con-Dive, LLC in August 2006, with McDermott succeeding to the former's rights. Plaintiff Secunda Marine Services ("Secunda"), another related entity, acted as manager of the charter.

Con-Dive acquired an expensive saturation-diving system ("the Equipment") and

---

[1] OSA's motion to file a substitute response, (Doc. 97), is **granted**. Its motion for leave to file a sur-reply, (Doc. 100), is **denied**. The parties jointly requested a specific briefing schedule, which did not provide for sur-replies. (Doc. 88.) The Court granted the parties' joint motion and explicitly stated that "the record on both Motions will be closed" on June 16, with the filing of the plaintiffs' reply. (Doc. 89.) OSA, having requested and received a specific briefing schedule, may not ignore it.

placed it aboard the Vessel.  OSA utilized the Equipment in the course of fulfilling contracts in or near Trinidad and Mexico.  When the charter party expired on or about March 31, 2009, charter hire of approximately $5 million remained unpaid.  The plaintiffs filed this action to recover the unpaid hire.

The plaintiffs moved for a writ of attachment pursuant to Supplemental Rule B, on the grounds that the defendants were not found in the district but that their property (the Equipment) was.  (Doc. 2).  The plaintiffs also moved for an order arresting the Equipment pursuant to Supplemental Rule C, on the grounds that they had a maritime lien against it.  (Doc. 3).  The Magistrate Judge granted both motions.  (Docs. 6, 7).

OSA filed a motion to vacate the arrest and attachment.  (Doc. 29).  After extensive briefing followed by a hearing, the Court granted the motion.  *McDermott Gulf Operating Co. v. Con-Dive, LLC*, 2009 WL 1537871 (S.D. Ala. 2009).  With respect to arrest, the Court concluded that, under governing Canadian law, breach of a charter agreement does not give rise to a maritime lien.  *Id*. at *6-7.  With respect to attachment, the Court concluded that, even if the plaintiff established the four elements necessary for such an attachment,[2] the attachment should be vacated based on equitable considerations.  *Id*. at *3-6.

In particular, the Court ruled that, under *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2nd Cir. 2006), a court has equitable authority to vacate an attachment under certain circumstances, including manipulation of the attachment process by leaving a district where attachment would be unavailable (because both parties are present) and going to another district where the defendant is absent in order to obtain attachment.  The Court noted that district court cases have applied *Aqua Stoli* when the

---

[2]The first such element is a valid prima facie admiralty claim against OSA. Although OSA is not a formal party to the charter agreement, the plaintiffs argued that OSA was the alter ego of Con-Dive and thereby became a de facto party to the agreement.  The Court did not determine whether the plaintiffs had met their burden as to this element.  (*Id*. at 6).

plaintiff ignores an available foreign forum in favor of a domestic one in order to obtain attachment.  The Court further noted that a court has equitable authority to vacate an attachment upon a showing of any improper practice or manifest want of equity on the part of the plaintiff.  The Court found as facts that the plaintiffs had been verbally ordered by a Mexican official on March 27 to relinquish the Equipment pending a government investigation; that the plaintiffs had initially complied but then refused to comply and actively disrupted efforts to offload the Equipment; and that the plaintiffs had then departed Mexican waters for Mobile with the Equipment still aboard.  The Court concluded that this conduct triggered its equitable discretion, whether or not the order was ultimately shown to be valid.  2009 WL 1537871 at *5-6.

The plaintiffs intend to appeal the Court's order vacating the arrest and attachment. In the instant motions, they ask the Court to stay its order while they appeal, and they ask the Court to require OSA to post bond as a condition to any release of the Equipment pending appeal.  Both requests are made pursuant to Federal Rule of Civil Procedure 62.

## DISCUSSION

"Whether a stay is warranted ... depends upon: (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Venus Lines Agency v. CVG Industria Venelozana de Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000); *accord Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The parties agree that this is the correct test.  (Doc. 85 at 3; Doc. 97 at 2).  The burden as to each of these factors is on the plaintiffs, not OSA.  *Drummond v. Fulton County*, 532 F.2d 1001, 1002 (5th Cir. 1976).

-3-

**I.  Likelihood of Success on the Merits.**

The plaintiffs recognize that, ordinarily, the movant must show "a probable likelihood of success on the merits of the appeal," which burden requires a showing that the trial court "was clearly erroneous."  (Doc. 85 at 3 (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).  They argue that, in the alternative, they may prevail by showing only a "substantial case on the merits," so long as "the balance of the equities [reflected in the remaining three considerations] weighs heavily in favor of granting a stay."  (*Id.* (quoting *Garcia-Mir*, 781 F.2d at 1453)).  Although *Garcia-Mir* was decided under Federal Rule of Appellate Procedure 8(a) rather than Rule 62, the Court assumes for present purposes that the plaintiffs can satisfy their burden under either *Garcia-Mir* formulation.

The plaintiffs identify three issues they maintain are likely to be successful on appeal: (1)  whether the Court misapplied Mexican law; (2) whether the Court exceeded its equitable discretion; and (3) whether the Court misapplied Canadian law.  (Doc. 85 at 4).  The Court considers these arguments in turn.

**A. Mexican Law.**

The plaintiffs claim that the Court made two erroneous rulings: (1) that the district attorney's command to transfer the Equipment to another vessel pending investigation, even though verbal rather than written, was a valid order under Mexican law; and (2) that the district attorney had jurisdiction to prevent the Vessel's departure from Mexican waters.  (Doc. 85 at 6-7).

The second alleged ruling simply did not occur.  The Court did not rule that a Mexican district attorney has jurisdiction to prevent a vessel from sailing.  The district attorney's direction not to sail was embodied in an April 5 order, and the Court noted that, while the plaintiffs focused much attention on the April 5 order and the district attorney's jurisdiction to give it, the question before the Court concerned the March 27 order, not the

April 5 order.  2009 WL 1537871 at *5 & n.8.  The plaintiffs cannot obtain reversal of the Court on a ruling it did not make.

The Court did rule that the district attorney's verbal order of March 27 was valid. 2009 WL 1537871 at *5.  As discussed below, the plaintiffs have failed to show they are likely to succeed in showing error, much less reversible error, in this ruling.

**1.  Likelihood that the Eleventh Circuit will consider evidence the plaintiffs did not present to the Court.**

As noted by the Court, OSA offered expert testimony that a verbal order of impoundment is valid under Mexican law, while the plaintiffs offered nothing.  2009 WL 1537871 at *4.  The plaintiffs do not suggest that the Court's ruling was erroneous given the evidence submitted.  Instead, they argue that their failure to present evidence on this issue is irrelevant to their appeal because they are entitled to present to the Eleventh Circuit evidence of Mexican law (the declaration of a Mexican lawyer) that they did not provide the Court.  (Doc. 85 at 5-7).

It is certainly true that the Court's determination of Mexican law is "treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1.  It is therefore true that the Eleventh Circuit's standard of review will be de novo.  *Seguros del Estado, S.A. v. Scientific Games, Inc.*, 262 F.3d 1164, 1171 (11th Cir. 2001); *United States v. Gecas*, 120 F.3d 1419, 1424 (11th Cir. 1997).  And it is further true that, at least in some circuits, the appellate court "may consider information not available to the district court."  *Banco de Credito Industrial, S.A. v. Tesoreria General*, 990 F.2d 827, 832 (5th Cir. 1993) (internal quotes omitted); *accord Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.3d 212, 216 (3rd Cir. 2006).

The plaintiffs provide no authority for the proposition that the Eleventh Circuit would adopt the view of the Third and Fifth Circuits.  Assuming it would do so, that view is only that the appellate court "may" consider materials not presented to the trial court,

not that it "must" do so.  *See also Ferrostaal*, 447 F.3d at 216 (while appellate court has the authority to conduct independent research as to foreign law, it has no obligation to do so); Fed. R. Civ. P. 44.1 advisory committee notes ("[T]he court is free to insist on a complete presentation by counsel."); *Ferrostaal*, 447 F.3d at 218 (quoting the notes and concluding the plaintiff had not established Tunisian law).  Thus, while the Eleventh Circuit may have the authority to review the declaration belatedly submitted by the plaintiffs, they have not explained why the appellate court is likely to exercise its discretion in favor of doing so.  There is good reason to believe it would not.

As discussed in the Court's order, 2009 WL 1537871 at *2, OSA announced on May 1 that it took the position the district attorney's verbal order to surrender the Equipment was valid.  (Doc. 30 at 7).  The plaintiffs expressly acknowledged that they understood from OSA's opening brief that OSA relied on the validity of a verbal order.  (Doc. 58 at 5).  Whether a verbal order is valid was thus in issue, and known to be in issue, from the moment the motion to vacate was filed.

The plaintiffs thus had almost three weeks before the May 22 hearing to develop any evidence they desired concerning whether a verbal order to surrender property pending a criminal investigation is valid under Mexican law.  The plaintiffs objected "in the strongest possible terms" to continuing the hearing from May 15, (Doc. 46 at 1), so they cannot complain that three weeks was an inadequate amount of time to prepare for the hearing.

The plaintiffs filed a number of briefs and evidentiary documents prior to the hearing.  (Docs. 41-44, 57-60).  None of these materials addressed the validity of a verbal order under Mexican law.  At the commencement of the hearing, the plaintiffs provided oral argument in opposition to the motion to vacate, following which the Court  asked if it had "everything in [its] possession right now that will support your position in the case?" (Doc. 95 at 20).  Counsel responded in the affirmative, requesting only an opportunity for rebuttal, (*id.*), which was granted but never utilized.  After OSA finished its presentation

-6-

of argument and evidence, the Court inquired of the plaintiffs if there were "any other matters that you want to present at this time," and counsel responded that "the only thing we would ask is the opportunity to address these late filed exhibits," (*id*. at 100), none of which concerned the validity of a verbal order.  After the exhibits were discussed, the Court asked a third time if there was "[a]nything further at this time," to which the plaintiffs were silent.  (*Id*. at 102).  Yet a fourth inquiry whether there was "[a]nything further," (*id*.), drew no response from the plaintiffs, at which point the Court announced, "Okay.  We will receive your objections by Tuesday, take it under submission and rule as soon as possible."  (*Id*. at 102-03).  Consistent with discussions at the hearing, the Court issued an order allowing certain evidentiary objections to be filed and concluding that, "[i]n all other respects, the record for purposes of OSA's motion to vacate is **closed**.  The Court will not accept additional factual material or legal argument."  (Doc. 61 (emphasis in original)).

Nevertheless, on the evening of May 26 and well after the Court had begun drafting its order, the plaintiffs filed a post-hearing brief and three exhibits, including the declaration of its Mexican law expert, (Doc. 71, Exhibit C), which it now intends to present on appeal.  The Court struck the brief and exhibits as incompatible with the plaintiffs' repeated confirmations that their evidence and argument were exhausted, the Court's resulting announcement that the motion to vacate was taken under submission, and its post-hearing order closing the record.  2009 WL 1537871 at *2.

The plaintiffs do not argue that this ruling was in error, and they could not successfully do so.  "We recognize that district courts enjoy broad discretion in deciding how best to manage the cases before them."  *Chudasama v. Mazda Motor Corp*., 123 F.3d 1353, 1366 (11th Cir. 1997).  The Eleventh Circuit has repeatedly employed this rule to uphold trial courts' enforcement of deadlines.  *E.g., School Board of Collier County v. K.C.*, 285 F.3d 977, 981-82 (11th Cir. 2002) (untimely expert testimony); *Enwonwu v. Fulton-DeKalb Hospital Authority*, 286 Fed. Appx. 586, 595 (11th Cir. 2008) (untimely

-7-

motion for summary judgment); *Edman v. Marano*, 177 Fed. Appx. 884, 886 (11th Cir. 2006) (untimely request for mental examination); *cf. Chapman v. AI Transport*, 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.").

The underlying principles are clear.  "[I]n order to ensure the orderly administration of justice, [a trial court] has the authority and responsibility to set and enforce reasonable deadlines."  *Lowe's Home Centers, Inc. v. Olin Corp*., 313 F.3d 1307, 1315 (11th Cir. 2002).  Accordingly, "[d]eadlines are not meant to be aspirational," and a litigant does not "ha[ve] carte blanche permission to perform when he desires."  *Young v. City of Palm Bay*, 358 F.3d 859, 864 (11th Cir. 2004).

These precepts have particular application here.  First, the Court was faced with a motion to vacate as to which both sides sought an expedited resolution.  (Docs. 35, 46). In order to comply with the parties' request, it was of course necessary to establish deadlines for presenting the parties' positions.  The Court, which received the case on May 14, (Doc. 47), promptly set the matter for hearing on May 22 and allowed the parties to file the additional materials they desired.  (Doc. 49).  Closing the record at the conclusion of the hearing was not only routine but essential to the expedited resolution the plaintiffs demanded.

Second, the Court did not close the record without input from the parties but repeatedly sought and received assurances from the plaintiffs that they had presented all their evidence.  The plaintiffs' representations that their case was complete could not have been clearer and could not have more justifiably induced the Court to close the record.

Third, the plaintiffs had ample time to obtain and present all evidence they desired. As noted, the motion to vacate was filed May 1 and the hearing was held May 22, some three weeks later.  Indeed, on May 14 the plaintiffs represented that they were ready to proceed to a hearing on May 15.  (Doc. 46).

-8-

Fourth, and as noted above, the plaintiffs admit that OSA's May 1 brief made plain to them that the validity of a verbal order was in issue. (Doc. 30 at 7; Doc. 58 at 5). They thus had the full three weeks to develop evidence that a verbal order is not valid, yet they chose not to do so for reasons they have never explained.

Fifth, the untimely filed declaration is not from a witness with whom the plaintiffs had no previous contact, but from an attorney who handles various matters for the plaintiffs and who had actually submitted a previous declaration in this case. (Doc. 59). It is thus clear that the plaintiffs could easily have produced his testimony as to verbal orders at any point before the hearing.

Sixth, due to the parties' insistence on a swift ruling, the Court immediately invested its time in preparing an order on the motion to vacate (including on a holiday weekend), and that work was well advanced when the plaintiffs submitted their post-hearing brief and evidence at 6:51 p.m. on May 26. Consideration of these late filings would have required the Court to revisit much of what it had already addressed, delaying resolution and wasting the Court's resources.

Seventh, the plaintiffs offered no satisfactory explanation for their conduct. Indeed, they did not even bother to seek leave of court to submit the untimely materials but simply filed them. In response to OSA's motion to strike, the plaintiffs represented that the filing was justified because, until the hearing, they did not know that OSA relied on a verbal order. (Doc. 73, ¶¶ 6-7). As noted above, this representation was flatly contradicted by the plaintiffs' own pre-hearing brief, when they themselves stated OSA's position as being that "the oral directions from a local District Attorney in Mexico" constituted the order it accused the plaintiffs of violating. (Doc. 58 at 5). Moreover, the plaintiffs admitted that OSA's May 1 brief articulates OSA's reliance on the verbal order of March 27. (*Id.*). Even had the plaintiffs' representation in opposition to OSA's motion to strike been accurate, their recourse was to request the Court at the hearing to allow time to respond, not to tell the Court their presentation was complete and then unilaterally

file unauthorized documents.

Eighth, the lawyer's declaration goes into any number of areas beyond that of whether a verbal order is valid, and the plaintiffs admitted that their purpose was to dispute OSA's arguments made at the hearing.  (Doc. 73, ¶ 4).  Likewise, the plaintiffs also submitted the supplemental declaration of another witness, (Doc. 71, Exhibit A), which they explicitly offered to counter OSA's arguments made at the hearing.  (*Id.*, ¶ 3).  That is, the plaintiffs engaged in not merely limited but wholesale dumping of evidentiary material after the record was closed.

Ninth, the plaintiffs' delay could have unfairly affected OSA's presentation.  OSA elected to present two live witnesses at the hearing, including its expert on Mexican law.  The plaintiffs elected to present no live witnesses and to rely exclusively on affidavits and declarations to provide testimony. That was of course their right, but they were required by Court order to submit any such evidence before the hearing.  (Doc. 49 at 2).  By submitting a declaration as to the effect of verbal orders only after the hearing, they deprived OSA of the opportunity to have their expert counter that declaration on the witness stand, where the Court could gauge his credibility.[3]

In short, the Court acted well within its discretion in excluding the belated declaration.  The plaintiffs have not attempted to show that the Eleventh Circuit, which likely would uphold the exclusion of the declaration, is nevertheless likely to consider it on appeal.  The Eleventh Circuit rule is that "we generally do not consider evidence that the parties did not submit in the district court," *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006), and the appellate court's inherent power to do so "is not

---

[3]This presumably was not the plaintiffs' motivation, although the Court notes that they opposed a one-week delay of the hearing because they believed they had obtained the upper hand in showing that OSA had no interest in the Equipment (and thus no standing to challenge its arrest and attachment) and wished to preserve that perceived advantage.  (Doc. 46).  The Court ultimately found that "there is no serious question of [OSA's] ownership."  2009 WL 1537871 at *3.

often exercised." *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1555 (11ᵗʰ Cir. 1989). The plaintiffs have not attempted to show that, despite this bias against considering evidence not presented to the trial court, the Eleventh Circuit is likely to consider the declaration. That it has the power to do so is no substitute for a showing that it is likely to exercise that power, especially given that it considers such exercises exceptional.

**2. Likelihood the Eleventh Circuit will conclude that the plaintiffs' tardy declaration accurately reflects Mexican law.**

Even were the Eleventh Circuit to consider the declaration on appeal, the plaintiffs have not shown likely success on the merits, because the declaration does not plainly establish that the district attorney's verbal order was invalid. The declarant relies on Article 16 of the Mexican Constitution for the proposition that a written order is required, but as he quotes it the provision applies only to action taken against a person "or against his family, home, documents or possessions." (Doc. 71, Exhibit C, ¶ 3). By the plaintiffs' own admission, the Equipment is not their property,[4] so Article 16 appears to have no application.

The declarant also relies on several sections of the Campeche Constitution. The translation appears less than precise, but in general it indicates that "[a]ll orders must be notified" by the district attorney, which includes service of a written notice along with the order (which is to be read when it is notified). This appears to mean that all written orders must be notified, but it does not so clearly mean that all orders must be written. Moreover, the declarant states that an order not properly notified is void, but the provision on which he relies states that the *notice* is void, not the order. There are exceptions even to voiding the notice, but they are contained in a provision the declaration omits. (Doc. 73, Exhibit C, ¶ 4).

---

[4] (Doc. 2 at 1-2; Doc. 41 at 3, 12; Doc. 58 at 1-4, 15; Doc. 95 at 9, 12-14). Indeed, this is a necessary factual predicate for attachment.

Because of these holes in the declaration, it is impossible to say that it is likely to cause the Eleventh Circuit to rule that the district attorney's verbal order was invalid.  In addition, there may well be other problems with the declaration, and if the plaintiffs are allowed to present the declaration on appeal, OSA likely will be allowed to present argument and evidence of its own to expose those problems, further draining the declaration of significance.  Finally, the directly contrary testimony of OSA's witness, and the evidence that the Mexican government does not consider the order invalid, 2009 WL 1537871 at *5, will have to be considered by the appellate court.

**3.  Likelihood the Eleventh Circuit will conclude that any error concerning the validity of a verbal order is reversible.**

Even were the Eleventh Circuit to consider the declaration, and even were it to conclude from the declaration that the district attorney's verbal order was invalid, that would not make the plaintiffs' success likely.  As noted, while the Court concluded that the verbal order was valid, it also concluded that equitable considerations warranted vacating the attachment regardless of the order's validity, on two separate grounds.  First, because OSA and the plaintiffs were all present in Mexico, subject to its jurisdiction and able to resolve their dispute there, yet the plaintiffs left Mexico in order to manufacture grounds for attachment in this district.  Second, because the plaintiffs, knowing they had been ordered to surrender the Equipment by a Mexican official possessing authority to issue such orders, elected to ignore the order based on their own opinion that it was invalid rather than requesting an appropriate government authority to rescind the order or declare it invalid, and by ignoring the order obtained attachment.  2009 WL 1537871 at *6.  The plaintiffs challenge the Court's analysis, but that is a matter for Part I.B.  For present purposes, it is enough to note that the plaintiffs cannot establish a likelihood of success on the merits merely by showing (which they have not) a likelihood of success on their argument that the verbal order was invalid.

**B.  Equitable Discretion under Rule B.**

As noted, the Court relied on *Aqua Stoli* and cases applying it to conclude that it has discretion to deny attachment on equitable grounds.  2009 WL 1537871 at *5-6.  The plaintiffs do not argue that *Aqua Stoli* itself, or the scenarios it sketched as justifying denial of attachment, are inconsistent with Eleventh Circuit law.  Instead, they argue that the *Aqua Stoli* scenarios are exclusive, such that vacating an attachment under any circumstances not precisely reflecting those scenarios is legally insupportable.  Because the Court found equitable justification for vacating attachment under circumstances similar to but technically beyond the *Aqua Stoli* scenarios, the plaintiffs conclude that it committed legal error.  They also question the Court's conclusion that they should have confirmed the invalidity of the verbal order before departing Mexico.  (Doc. 85 at 9-11).

**1.  Likelihood the Eleventh Circuit will consider an argument the plaintiffs did not present to the Court.**

The threshold difficulty with the plaintiffs' position is that they did not raise it before losing the motion to vacate.  OSA urged the Court to adopt precisely the extension of *Aqua Stoli* that the Court did adopt and to which the plaintiffs now object, citing and describing precisely the cases on which the Court relied.  (Doc. 30 at 9-10, 22-23).  The plaintiffs, through two pre-hearing briefs and extended oral argument, never once articulated or even intimated any disagreement with the legal proposition that vacation on equitable grounds would be justified in such circumstances.  Indeed, they did not quarrel with the idea of vacation on equitable grounds at all.  At the hearing, counsel for OSA correctly stated that "[i]t appears to be common ground that courts are empowered to vacate attachments on equitable grounds.  We have no disagreement from Plaintiffs on that, we cited numerous cases in support of that proposition."  (Doc. 95 at 35).  Counsel then discussed the cases vacating attachment on the grounds ultimately relied on by the

Court.  (*Id*. at 42).  The plaintiffs, though given multiple opportunities to respond, stood silent.  (*Id*. at 100-02).  Not even their unauthorized post-hearing submission takes issue with OSA's legal position.  (Doc. 71).

As with their effort to inject on appeal evidence they could have but did not present the Court, the plaintiffs' plan to charge the Court with legal error on a point they never raised faces stern challenges.  *E.g., Ledford v. Peeples*, 2009 WL 1425256 at *25 (11th Cir. 2009) ("It requires no citation to authority to say that, except when we invoke the 'plain error' doctrine, which rarely applies in civil cases, we do not consider arguments raised for the first time on appeal."); *Millenium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1304 (11th Cir. 2007) ("Arguments raised for the first time on appeal are not properly before this Court.") (internal quotes omitted).  The plaintiffs ignore this difficulty and so have failed to show any likelihood of success on appeal.

### 2.  Likelihood the Eleventh Circuit will confine equitable discretion under Rule B to the precise *Aqua Stoli* scenarios.

Even were the Eleventh Circuit to consider the plaintiffs' belated argument on appeal, they have not shown a likelihood of success on the merits.  The plaintiffs' argument is that *Aqua Stoli*'s three scenarios are exclusive, yet even the *Aqua Stoli* Court did not consider them so.  On the contrary, it prefaced its listing by specifying that "the precise boundaries of a district court's vacatur power are not before us."  460 F.3d at 444. The plaintiffs suggest that the Second Circuit recently narrowed *Aqua Stoli*, (Doc. 85 at 11 n.2), but in fact it expressly confirmed that *Aqua Stoli*'s three scenarios are but "example[s]" of circumstances justifying equitable vacation.  *Williamson v. Recovery Limited Partnership*, 542 F.3d 43, 51 (2nd Cir. 2008).

The plaintiffs acknowledge the general equitable authority of district courts in this

Circuit sitting in admiralty, (Doc. 85 at 10),[5] and they identify no case suggesting that the Eleventh Circuit would nevertheless refuse to go beyond *Aqua Stoli*'s four corners, as have district courts in the Second Circuit.  Instead, they argue that employing equitable principles here "undercuts the very policy of maritime attachment," which they define as "to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy the judgment."  (Doc. 85 at 10 (quoting *Aqua Stoli*, 460 F.3d at 443)).  Nothing in this general statement supports the proposition that it is the  policy of admiralty law to allow attachment wherever property of the absent defendant may be found, regardless of the plaintiff's misconduct in bringing the property there.

On the contrary, the plaintiffs admit that the second *Aqua Stoli* scenario (with which they have no quarrel) is designed to "prevent the manipulation of jurisdiction" among various federal district courts.  (Doc. 85 at 10).  The plaintiffs' conduct in this case amounted to a clear manipulation of jurisdiction, both because the parties and the Equipment were in Mexico and subject to its jurisdiction and because the plaintiffs took the Equipment from Mexico to Mobile for the precise purpose of attaching property they knew to be subject to a Mexican governmental impoundment order they had not bothered to have set aside or declared invalid.  In the face of this clear manipulation of jurisdiction, it can make no meaningful difference that the plaintiffs manipulated jurisdiction between countries rather than between districts.

_____

[5]As the Court noted in its order on motion to vacate, the Eleventh Circuit has frequently employed equitable principles in a maritime context.  *See, e.g., Sea Byte, Inc. v. Hudson Marine Management Services, Inc*., 2009 WL 1044702 at *8 (11th Cir. 2009) (equitable estoppel); *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 940 n.2 (11th Cir. 2001) (concursus); *Venus Lines Agency, Inc. v. CVG International, Inc*., 234 F.3d 1225, 1230 (11th Cir. 2000) (laches); *Parker Towing Co. v. Yazoo River Towing, Inc.*, 794 F.2d 591, 594 (11th Cir. 1986) (prejudgment interest); *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 565 (5th Cir. 1981) (injunction).

**3.  Likelihood the Eleventh Circuit will find reversible error in the Court's conclusion placing responsibility on the plaintiffs.**

The legal aspect of the plaintiffs' argument is that "[o]ne would assume" the "onus" was on the district attorney to seek to enforce his order, not on the plaintiffs to confirm its invalidity.  (Doc. 85 at 9).  It is not immediately apparent how the plaintiffs' assumption establishes that Mexican law sanctions a refusal to obey a known government order until the government tries harder to enforce it.[6]

Nor does the plaintiffs' assumption establish the parameters of fair and equitable conduct for purposes of Rule B analysis.  As the Court found, the plaintiffs knew they had been ordered by a Mexican district attorney to surrender the Equipment pending criminal investigation, and they knew that Mexican district attorneys have such authority.  Under such circumstances, they were not free, from an equitable standpoint, to rely on their unilateral conclusion that the order was invalid because verbal.  As the Court stated, "[t]o allow attachment under such circumstances would be to encourage every litigant to make its own decision whether to obey a government order, based on its own, usually biased, assessment of the order's validity.  That way lies anarchy, not equity."  2009 WL 1537871 at *6.

The factual aspect of the plaintiffs' argument is that they had no way to confirm the validity vel non of the March 27 verbal order.  (Doc. 85 at 9).  This is a curious suggestion, given that the plaintiffs went to the district attorney's superior in order to secure rescission of the district attorney's April 5 order that the Vessel not sail.  The

---

[6]The district attorney certainly attempted to enforce his order.  Indeed, two pieces of equipment were successfully removed to another vessel before the plaintiffs disrupted the proceedings by destabilizing the Vessel so that the crane could not operate.  The plaintiffs fault the district attorney for not arresting their representatives on the spot, (Doc. 99 at 2, 4), but any number of considerations — from following protocol to avoiding an international incident aboard a vessel that was openly hostile, and everything in between — could have prompted his restraint.  Certainly the district attorney did not let the matter rest, as he issued an order on April 5 to prevent the Vessel from leaving Mexico with the Equipment.

Court has found that the plaintiffs could easily have traveled the same road with respect to the March 27 order, 2009 WL 1537871 at *6 n.11, and the plaintiffs have not explained why the Eleventh Circuit is likely to consider that finding clearly erroneous.[7]  Moreover, had the plaintiffs been dissatisfied with the superior's response, they presumably could have requested and received a judicial ruling.[8]

### C.  Canadian Law.

Without explanation, the plaintiffs ask the Court to "recognize that Canadian authority is divided on" whether breach of a charter agreement gives rise to a maritime lien.  (Doc. 11).  In their reply brief, they downgrade their to position to "debatable." (Doc. 99 at 2 n.1).  If there is any division or room for debate, it is not detectable from the plaintiffs' filings.  As addressed in the Court's order on motion to vacate, OSA's expert clearly stated that breach of a charter agreement does not give rise to a maritime lien under Canadian law, and he provided thorough reasoning and direct authority for the proposition; the plaintiffs' evidence was completely non-responsive.  2009 WL 1537871 at *7.  The plaintiffs have shown no possibility of succeeding on this issue.

### D.  Summary.

The plaintiffs have failed to show a "probable likelihood of success on the merits" of their appeal as to any of the three grounds they intend to pursue.  Nor have they shown a "substantial case on the merits," especially since they have not shown that the Eleventh

---

[7]The plaintiffs suggest they "attempt[ed] to resolve the district attorney's legal authority by communicating with the proper Mexican authorities."  (Doc. 85 at 9).  This is correct, but only with respect to the April 5 order, not the March 27 order at issue here. 2009 WL 1537871 at *5 (citing Doc. 59, ¶ 8).

[8]Under Mexican maritime law, a carrier challenging the impoundment of equipment can request a hearing before a judge where the equipment is located.  (Doc. 55, ¶ 15).

Circuit would reach the merits to begin with.  Even had the plaintiffs made such a showing, as discussed below the remaining three factors do not "weigh heavily in favor of granting a stay."

## II.  Irreparable Injury.

The plaintiffs argue that, unless the vacation order is stayed, the Equipment will likely leave the jurisdiction, mooting the appeal (the purpose of which is to reinstate attachment).  (Doc. 85 at 12).  As the plaintiffs' own authority states, however, "[a] majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm," *In re: Adelphia Communications Corp.*, 361 B.R. 337, 347 (S.D.N.Y. 2007), and the plaintiffs have not endeavored to show that the Eleventh Circuit embraces the minority view.

"Certainly the fact that the decision on the stay may be dispositive of the appeal in some cases is a factor that an appellate court must consider, but that alone does not justify pretermitting an examination of the nature of the irreparable injury alleged and the particular harm that will befall the appellant should the stay not be granted."  *Republic of the Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3rd Cir. 1991).  That is, the plaintiffs cannot rely simply on the possibility or even the probability that the Equipment will leave the district during their appeal; instead they must show that, without the res, they will suffer irreparable injury.

The plaintiffs note that removal of the Equipment would deprive them of their "only security against the moneys owed by [a] transient debtor."  (Doc. 99 at 5).  That is presumably correct, but it does not show that, without the res, they cannot collect any judgment for unpaid charter hire.  The plaintiffs posit that OSA "has demonstrated an inability to cover its outstanding debts," (Doc. 85 at 12), but they offer no evidence to support their position.  The mere fact that OSA has not paid does not mean that it cannot pay, else every creditor would automatically establish irreparable injury — even when, as

here, the debtor offers reasons why it is not legally obligated to pay.[9]   The only evidence concerning OSA's solvency vel non is that, in 2008, it won six contracts with Pemex valued at approximately $293 million.  (Doc. 97, Exhibit A, ¶¶ 4, 7).  While contracts are no guarantor of solvency, it would require far more than the plaintiffs' ipse dixit to draw into question the ability of a firm doing business on such a scale to pay a $5 million judgment.  *See, e.g., In re: Kummer*, 2009 WL 73252 at *2 (D. Nev. 2009) (denying stay pending appeal because the appellant "has made no showing that [the appellee's] financial situation is such that he will not be able to pay" an ultimate judgment should the stay be denied); *Centauri Shipping Ltd. v. Western Bulk Carriers*, 528 F. Supp. 2d 186, 194-95 (S.D.N.Y. 2007) (refusing to stay the vacation of an attachment pending appeal where the appellant failed to show the appellee was actually or imminently insolvent).

In summary, this factor does not weigh heavily in favor of the plaintiffs and in fact weighs against them.


**III.  Harm to OSA.**

OSA has presented uncontested evidence that it will be harmed by a stay.  While its listing includes past damages[10] and future damages that are independent of a stay,[11] it is clear that OSA will experience future damages, probably in the millions of dollars, if a stay pending appeal is entered.

The plaintiffs left Mexico with the Equipment days before OSA began a four-month Pemex project that required a saturation-diving system.  Had the Equipment

---

[9]OSA notes that Con-Dive, not OSA, is party to the charter agreement from which the obligation to pay charter hire springs.  The plaintiffs argue that OSA is liable as Con-Dive's alter ego, but — at the plaintiffs' insistence, (Doc. 41 at 12-14; Doc. 95 at 15) — no definitive ruling on OSA's status has been made.

[10]These include expenses incurred and income foregone before the stay was vacated.

[11]These include the cost of transporting the Equipment from Mobile to Mexico.

remained in Mexico, it would have been loaded on the Don Amado, a vessel with the necessary crane and specifications for the project, which would have allowed OSA to complete the project with a single vessel. Because the Equipment was unavailable, OSA was required to utilize two vessels on the project — the Don Amado and the Caballo de Mar, which is permanently equipped with (and so unable to transfer to another vessel) a saturation-diving system. (Doc. 97, Exhibit B, ¶¶ 2-6).[12]

This arrangement is costing OSA in two ways. First, it has the extra expense of keeping a second vessel on the Pemex project, and it is receiving no additional compensation from Pemex to offset this expense. Second, the Caballo de Mar, which rents for about $3 million a month and is usually booked, is unavailable for hire. There are about two months left on the Pemex project, so these losses will accrue for at least this long. (Doc. 97, Exhibit B, ¶¶ 7-8).

As noted, the plaintiffs do not dispute OSA's version of future damages. Instead, they suggest that OSA can avoid these damages by posting a $5 million bond to secure release of the Equipment pending appeal. (Doc. 85 at 12-13; Doc. 99 at 6). A court vacating an attachment is authorized to require such a bond, but only if it stays the vacation pending appeal. *Venus Lines*, 210 F.3d at 1314. As this order concludes, the plaintiffs are not entitled to a stay, so the Court cannot order OSA to post a bond. This point alone is dispositive, but the plaintiffs' argument is shot through with other deficiencies.

By posting a bond, OSA would gain the use of the Equipment, but it would simultaneously lose $5 million of bonding capacity. That bonding capacity is an important asset, because OSA's work is entirely dependent upon Pemex contracts, and it must post a 10% performance bond when it is awarded a contract, else lose the contract. OSA has seven bids outstanding and will be bidding on numerous additional projects

---

[12]OSA states that it would have been allowed to use the Equipment after its impoundment and pending completion of the criminal investigation, (Doc. 97 at 17), and the plaintiffs do not challenge this assertion. (Doc. 99 at 5-6).

during the pendency of the plaintiffs' appeal, and it cannot know in advance how many it will be awarded (in 2008, it was successful on six of 27 bids).  Withdrawing $5 million of bonding capacity from OSA thus risks the loss of $50 million in revenue.  (Doc. 97, Exhibit A).

The plaintiffs respond only that any potential loss of revenue if OSA posts a bond is merely speculative.  (Doc. 99 at 5-6).  The Court views OSA's evidence — which the plaintiffs do not counter with evidence of their own — as reflecting a real, if unquantifiable, risk of substantial harm.  At best, the plaintiffs are able to say that OSA *may* not be substantially injured by a bond requirement.  Their burden, however, is to show that OSA *will* not be substantially injured, and this they cannot do.[13]

Moreover, a release bond must be purchased.  The plaintiffs have not attempted to show that the cost of such a bond is de minimis, and they have refused to pay the cost of the bond themselves.  At most, they would consider — but not commit to — posting a bond to cover OSA's cost of procuring the bond —  which would repay OSA its cost if, but only if, OSA prevails on appeal.  (Doc. 85 at 13 & n.3; Doc. 87, ¶ 7; Doc. 99 at 7 & n.5).  While OSA seems likely to prevail, the possibility it will not, and the possibility that the plaintiffs will not secure OSA's bond cost to begin with, prevent the plaintiffs from showing that OSA will not be substantially injured by a release bond requirement.

In summary, this factor does not weigh heavily in favor of the plaintiffs and in fact weighs against them.

## IV.  Public Interest.

The plaintiffs assert that "the public can only benefit from a final resolution of the serious legal issues that will be decided on appeal."  (Doc. 85 at 14).  As noted in Part I, it

---

[13]The plaintiffs warn that OSA's position as to future harm "could be raised to defeat a security requirement by any party asked to post a bond."  (*Id*. at 6).  Not likely, because most analyses of bond requirements do not occur in the context of a losing party demanding that a prevailing party post bond while the losing party appeals.

is unlikely the Eleventh Circuit will even reach the legal issues the plaintiffs plan to present on appeal.  Nor do they identify any authority for the proposition that the public interest factor for purposes of a stay pending appeal is so easily satisfied.[14]  Because the plaintiffs have identified no public interest favoring a stay, this factor does not weigh heavily in favor of them and is at best neutral.

## CONCLUSION

For the reasons set forth above, the plaintiffs' motion to stay pending appeal is **denied**.  The plaintiffs' motion to fix bond, which depends on the premise that the Court is granting the motion to stay, (Doc. 87, ¶ 5), is **denied as moot**.

DONE and ORDERED this 29th day of June, 2009.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[14]The plaintiffs cite *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981), but the Court can locate no passage on this page or elsewhere supporting the plaintiffs' position.